The opinion of the Court was delivered by
Johnston, Ch.
James Heyward, by his last will, bearing date the 10th of May, 1796, devised and bequeathed, (in the event which happened, that at the time of his decease he should leave no lawful issue,) his whole estate, as follows:
“ If I die without lawful issue, I give, devise and bequeath all my estate, real and personal, whatsoever and wheresoever, unto my beloved wife, Susan HeywaRD ; to have and to hold the same, and every part and parcel thereof, and all the rents, issues and profits thereof, unto the said Susan Heyward, for and during, and until the end and term of her natural life,— free of waste and charges of waste, whatsoever. And from and after the decease of my said wife, I give, devise and bequeath all my said estate, real and personal, unto my brother, Nathaniel HeywaRD ; to have and to hold the same, and every part and parcel thereof, unto the said Nathaniel, his heirs, executors, administrators, and assigns, forever: Provided, always, nevertheless, that my said brother, Nathaniel Heyward, shall, and do; faithfully and punctually pay unto my brother, *312 Thomas HeywaRD, or his heirs, the full and just sum of five thousand pounds, lawful money of the State of South Carolina, —one moiety thereof to he so paid at the expiration of one year from and after the decease of my said wife, Susan Hey-ward, — and the other moiety thereof to be paid at the expiration of two years from and after her decease: — And with the payment of the said sum of five thousand pounds, in manner aforesaid, I hereby charge and make liable all my estate, real and personal, from and after the decease of my said wife.” * * ******** “ And I do hereby make and appoint my said -wife, Susan Heyward, the sole executrix of this, my last will and testament.”
During the life of Mrs. Susan Heyward, (afterwards the wife of Charles Baring,) Thomas Heyward gave to his brother Nathaniel, the following instrument, viz.:
“Memorandum. — 25th June, 1802. Whereas, my brother, Nathaniel Heyward, has met the decree obtained by William Brailsford against me, and fully satisfied the same, amounting to four thousand one hundred and sixty-one pounds, twelve shillings and two-pence — in consideration thereof, I promise to pay to my said'brother, out of the legacy of five thousand pounds given to me by my brother James, — whenever the same shall become due, — the aforesaid sum of four thousand one hundred and sixty-one pounds twelve shillings and two-pence, with interest from 8th October, 1801. And, if the interest should exceed the amount of the legacy, when it becomes due, then the deficiency to be made good out of any part of my estate.” (Signed) “Thomas Heyward.”
Thomas Heyward died in 1809, during the life of Susan Heyward, (afterwards Mrs. Baring,) the widow of the testator James. Mrs. Baring survived until 1845.
At his death, Thomas Heyward left the following family:
1. Elizabeth, his widow, to whom he willed his whole estate.
2. Elizabeth Matthews Heyward, (now Mrs. Hamilton,) a daughter of his oldest and pre-deceased son Daniel.
*313 3. Thomas Heyward, a son: afterwards he died intestate, and his son, T. S. Heyward, is his administrator.
4. James Heyward, a son. He died afterwards intestate, and his wife, Decima, is his administratrix.
5. Eliza Heyward, a daughter, (now Mrs. Parker).
In 1823, Elizabeth, the widow of Thomas Heyward, Sen., who was his executrix, and to whom he devised his whole estate, (charged by the memorandum of 1802,) came to an arrangement with Nathaniel Heyward, by which the legacy of five thousand pounds was set off against the sum which Nathaniel had advanced for his brother, with interest on the latter, and she gave him bond, secured by mortgage, for one-half the excess still due to Nathaniel, he remitting the other half.
In 1845, Mrs. Baring, the widow of the testator, James Hey-ward, died; by which her life tenure in his estate, under his will, determined; and the remainder accrued in possession to Nathaniel Heyward.
Nathaniel died in 1851; and the present bill was filed in 1852, against his executors, by Mrs. Hamilton in her own right, and by the administratrix of James, Jun., as heirs of Thomas Heyward, Sen., claiming payment of shares of the legacy of five thousand pounds.
The question is, whether the direction given, that the five thousand pounds he paid “to Thomas Heyward or his heirs,” created alternative interests between these parties, so that the heirs became substitutes, in place of Thomas, from the time of his death.
In the argument in support of the decree, it has been assumed throughout, that there was a fixed intention, on the part of the testator, to give the largest interests to his two brothers, of which the property bequeathed to them, respectively, was capable. That as the remainder given to Nathaniel was given absolutely, so it was testator’s intention that Thomas should have an absolute and unqualified right to the legacy of five thousand pounds.
*314 But this is to beg the very question before us. If this assumption he admitted, there is an end of this case.
There is an observation of Lord Hardwicke, in one of his judgments,(a) very pertinent to this point. “ It has been said,” he remarks, “ that if the testator had been asked, at the time of making his will, whether, in such an event as has happened, he would’ have the one thousand pound legacy raised for the plaintiff, he certainly would have answered, that he would not. But such a manner of arguing, by asking a question of this sort, is a very uncertain one. Those that make the question answer it themselves: and give such an answer as seems for their purpose.”
The true rule is stated by Sir Jno. Leach in another case.(b) “ What the intention of the testator was, must be looked for in the words of the will. Nothing more can be supposed to be intended than what he has expressed. The expression may be, often, at variance with the real intention; and it may be so here; but a Court must decide on the expressed intention.”
The observation has been correctly made, “ that the statute by requiring a will to be in writing, precludes a Court of Law from ascribing to a testator any intention which his will does not express; and, in effect, makes the writing the only legitimate evidence of the testator’s intention. No will is within the statute but that which is in writing: — which is as much as to say, that all that is effectual, and to the purpose, must be in writing, without the aid of words not written.”(c)
“How can it be said that the will is in writing, if it be inoperative, unless the intention of the testator be proved aliunde V’(d)
And if you are not permitted to prove an intention extrinsic to the will, how are you at liberty to assume it without proof?
*315 But in all doubtful cases the construction is to be made from tbe -whole instrument, — text and context.
The context is to be consulted upon the principle, so familiar to courts, that the words and acts of parties have a tacit reference to the circumstances under which they are uttered or performed: and that these circumstances, so far as they may serve to give construction to them, may, and should, be, appealed to for that purpose.(e) Thus if a gentleman writing simultaneously to his overseer, and to his agent for transactions in bant, should, in the same words, direct them, respectively, to sell Ms stoejc; the words, though identical, must mean very different things; in the former case referring to live stock, and in the latter to shares, stocks, or securities. The same principle is familiar in criminal courts. What is it that shows an act of homicide to be murder in one case, manslaughter in another, or excusable or justifiable in another, but the circumstances under which the act was done ? The principle is universal.
And so of the context of a writing. The context is a reference to, or description of, the surrounding circumstances by the writer himself; and maybe looked to for the purpose of clearing up obscurities in any particular passage.
Let us, therefore, resort to the context of this will to see whether there was in the testator’s mind that degree of benevolence towards his brother, Thomas, which has been assumed.
Look to the terms in which.he bestows upon his brother, Nathaniel, the remainder upon which this legacy is charged. It is given “to Nathaniel, and to his heirs, executors, administrators and assigns, forever.” This shows that where the testator intended to give in the amplest and most absolute manner, he knew how to accomplish his purpose. Reddendo, singula singulis, the real estate is given to him and his heirs forever, in fee: while the personal is bequeathed to him, his personal representatives and assigns: an absolute, vested, transmissible, *316 assignable interest. If his purpose was to give an absolute interest in the legacy to Thomas, why did he make so sudden and marked a change in the terms of donation ? Why did he not give it to him, (as he had given to Nathaniel,) his exr ecutors, administrators and assigns ? Why the change to him or his heirs ?
Thus the context of the will, so far from sustaining the conjecture of the defendants as to the extent of the bounty intended for Thomas, rather tends to a different conclusion. The least that can be said is, that it does not disturb, or deflect, the import of the words of the text.
Then we are to inquire what is the natural and legal effect of a direction that Nathaniel pay two thousand five hundred pounds one year from the expiration of the life estate, and two thousand five hundred pounds more, two years from its expiration, “ unto my brother, Thomas Heyward, or his heirs.”
The usual and natural construction of the word or is disjunctive (f): and we are to construe the words of every testator in their ordinary and natural sense, unless there is something in the context to impose a different meaning on them, ox*, unless there is something in the nature of the interest created, taken in connection with the operation of the other parts of the will, which would defeat the clear legal intention, were the usual interpretation given.
It is not necessai’y here to examine the precedents, where a conjunctive, and not a disjunctive, construction has been given to this word: because, as we have seen, there is nothing in the context requiring such construction.
It must, therefore, be left to its ordinary signification; which is entirely disjunctive.
It is impossible for an ordinary reader to peruse the words of this will, relating to the legacy of five thousand pounds, without the impression that there was an alternative in the *317 testator’s mind as to who should receive it — Thomas, or his heirs. His words show it.
Now every word in a will must he presumed to have been used with some intention, unless the context or the rules of law render it necessary to regard it as surplusage (g); and if it can be done without violating legal rules or principles, effect should be given to every word in the sense in which it was intended.
There is nothing illegal in a man’s directing payment of a legacy to another and his heirs: hut the law will, in such case, give him the sole benefit.
Nor, on the other hand, is there anything illegal in a direction that a legacy be paid, at a particular time, to one — or to his heirs, as substitutes, in case he be then dead.
If this is the meaning and legal construction of James Hey-ward’s will, full effect should be given to it.
And here I assume, once for all, that the word heirs, when applied as in the present instance, to personalty — a subject not inheritable — was meant to designate those persons pointed out by the statute to succeed to Thomas’s estate. (See statute of 1791, which gives the same distribution to intestate estates, personal and real.)
The word heirs thus applied, by way of description, is as effectual a designation of persons to take by purchase, as issue, heirs of the body, heirs lawfully begotten, or any other form of description. The only difference between issue and heirs in such a connexion is that under the former all lineal descendants take; while the word heirs may exclude some of the lineal descendants, and include persons who are not lineal descendants. The difference between heirs (generally) and heirs of the body or lawfully begotten, is that heirs includes all dis-tributees, while the other terms are not only confined to issue, but to such issue as fall within the table of the statute. And *318 •wherever heirs, or special heirs, are mentioned creating a reference to the statute, the statute exhibits the extent of their interests (h).
If the direction had been to pay to Thomas, or, in ease of Ms death, to his heirs, there are many precedents to show that the heirs would have taken by substitution. But as heirship can only be predicated of persons left by an ancestor to succeed to his property; in other words to take in case of his death-, these words (unless the context is to the] contrary) are always implied in all gifts made to persons designated as heirs (i).
Then we may read this will as if the words were that, at the time specified, the legacy of five thousand pounds should be paid to Thomas Heyward, or, in case of his death, to his heirs, i. e., to those persons left at his death to succeed to his estate. These words, it will not be disputed, would have given a sub-stitutional interest. In such a text the word “ or” would have been emphatically disjunctive.
The case of Corbyn vs. French (j), mentioned in the decree, and much relied on here by the defendants, is not inconsistent with the view I am taking, but in some respects tends to confirm it.
The testator in that case, after directing a sale of a portion of his estate, disposes of part of the proceeds as follows:
“ And I further give and bequeath to my aforesaid niece, Elizabeth Cooper, the sum of two thousand pounds, (or to her proper representative, in case she should not be living at the decease of my wife.) I also give to each of the children of my sister, Elizabeth [Barker] — viz: John, Dorothy, William and Christopher (Barker), or their representatives or representative, the sum of two thousand pounds. The remainder I direct to *319 be equally divided between Josiah Messa, aforesaid, and John (Oorbyn), the son of my very worthy and much respected friend and partner, Thomas Oorbyn, share and share alike.”
John Barker died during the testator’s life, leaving a widow and children. Christopher Barker survived the testator, but died during the life of his widow.
The bill was filed by John Oorbyn, as residuary legatee, for an account of the personal estate of the testator, and, among other things, to have the legacies of John and Christopher Barker, declared to have lapsed, and fallen into the residue.
The Master of the Bolls stated the question before him thus: — “ One of these children (John Barker) died in the life of the testator. Another (Christopher Barker) survived the testator, but died in the life of his widow. The question is, whether they (their legacies) ai e vested and transmissible to their representatives.”
“ As to the legacy to John, I think the question can hardly be raised upon this will. For, see the preceding legacy ■ to Elizabeth Cooper. Would not that have lapsed, if Elizabeth Cooper had died in the life of the testator ? Beyond all question it would. It is nothing more than saying it shall go to her representatives if she dies before his wife.” He proceeds to argue that the interests given under the will, being intended only as beneficial interests to the legatees, must vest in the legatees before they would become transmissible; and remarks that, “ The rules upon which the Court proceeds are perfectly established: — a testator is never to be supposed to mean to give to any but those who shall survive him, unless the intention is perfectly clear.” * * * “ It is perfectly clear, that when the fund is given to one for life, and after the death of that person, to several others, and in case of their deaths to their representatives, there is no reason to presume an intention that it shall not lapse by the death of the legatee in the life of the testator. It is ^impossible, without transgressing every *320 rule as to vesting, to hold that this legacy vested — the legatee not having lived to take the benefit under the testator’s will.”
It is manifest that the Judge in this case was determining the question upon the point of lapse alone. The legacy being given to John, lapsed by his death in the testator’s life, and the lapse was not saved by the extension (had there been words to that effect) of his interest to his personal representative, or executor, — the interest to John or his executor being identical. But his Lordship argues that the words “ or to their representatives” did not refer to a time antecedent to the testator’s death — on the contrary they referred to the period of the life estate, and although unnecessary in that connexion, were thrown in to put the legacies when vested out of doubt.”
“ I am very clearly of opinion,” says he, “ the legacy to Christopher is good.” Christopher, it will be remembered, survived the testator, and became capable of taking the interest conferred on him.
“ This is stronger than the common case of a legacy to A. and his representatives. There those words are surplusage: for if the testator dies before the day of payment, it would go to his representatives. But in this case there is a reason for inserting them. This is not an immediate legacy — but after the death of another person. There is, therefore, an interval in which the legatee might die; and though it vested, he might not live to receive it. That addition might be inserted to put it out of doubf, and must mean, in case they die in the life of the testator's wife. I desire to be understood to determine it upon that circumstance — that there is a life intervening.”,
It is to be observed that the real question in this case was lapse or no lapse: to be determined by the consideration, in the first place, whether the legatee ever took a personal interest by surviving the testator: and if he did not, then, whether the superadded words, relating to his representatives (taking the word in its legal sense) were intended to save the lapse by referring to a time anterior to the testator’s death.
*321 And it is remarkable, also, that the word in that case was representatives and not heirs ; and is so considered throughout the judgment.
The difference is quite material. It is not determined in that case that if the legacy had been to Christopher or his heirs, these- words would not have been construed to create alternative interests, between him and them, as there was an interval in which he might die, and “ not live to receive it,” there being “a life intervening.” In such case, the Court might have regarded the words “ or his heirs” to have been inserted for a more substantial purpose than “ to put it out of doubt.”
It is familiar that such words are interpreted disjunctively, and for the purpose of creating a substitution, to prevent lapse, when the legatee, named in the will, dies in the testator’s life: as in Gettings v. McDermott,(k) one of the cases mentioned in the decree.
But it seems hardly possible to give such a construction to Price v. Lockley,(l) another of the cases cited in the decree. That is a case much in favor of the plaintiffs in the present cause.
The testator by his will, after certain legacies, directed that his monies and choses should be collected and vested in public funds for the use and behoof of his wife and two children, Eliza and Joseph, during the wife’s life, or widowhood, “and at the decease of my said wife, I give and bequeath the same to my said (4) children, — the survivor, or survivors of them, equally, share and share alike, — or to their heirs lawfully begotten.”
The residue of the estate was also given to testator’s wife, during her life or widowhood: “and after her decease, or second marriage, I will and direct that the same be disposed of *322 by sale, and the money equally divided among my said (4) children, or the survivor of them, or thei'r heirs as aforesaid.”
Testator died in 1805. Joseph survived him and assigned his share to one James, but died during the widow’s life, — he having died in 1837 and she in 1841.
The contest Vías between James, the assignee of Joseph, and five children left by Joseph at his death.
It was contended for James, the assignee, that Joseph, on surviving the testator took a vested interest, in One-fourth of the residue : and that it passed under his assignment.
For the children it was insisted, that if testator’s four children survived the tenant for life, they would have taken absolutely between them: and that on the death of any of the four, in the life of the widow, (meaning without issue) the survivor would have taken; but, if they left children, such children would take the share of the parent by substitution, —wherefore, Joseph had no interest to pass by assignment.
The case seems to have been regarded as very plain : — “ the master of the Rolls” (Lord Langdale) “ was of opinion that in the event which had happened,” (which I have just stated) the children of Joseph took one fourth” (Joseph’s share) “ by substitution.”
This case appears conclusively to establish that the word “or” has an effect much beyond that of merely saving a lapse.
When it is effectual to save a lapse, it accomplishes that purpose only by creating substitutional interests. This is permitted to carry out the intention of the testator. But as lapses are in such cases saved only by substitutional words, why should the operation of such words, when intended to create substitution, be confined to cases of lapse ? and not applied in every other case and for every other purpose which the intention requires ?
It has been observed that the words of description in this case of Price v. Lockley are heirs lawfully begotten and not heirs as in this ease.
*323 I trust I have sufficiently explained, heretofore, that that does not affect the application of the principle of that case to the one before us.
Then see the case of Girdlestone v. Doe.(m) Thomas Doe bequeathed to Mary Tattersall, the yearly sum of forty pounds, to be paid from interest and dividends of stock in the long annuities, during her life:-and after her death, he bequeathed the same to his nephew, James Holman, “or his heirs.” After testator’s death, and in the life time of Tattersall, Holman sold and assigned his annuity of forty pounds to Grirdlestone, and then died during the life of Tattersall. On the death of Tat-tersall, Grirdlestone filed his bill against the surviving executrix of Doe, to enforce his assignment. Demurrer to the bill.
Argued for plaintiff that the word “ or” must have a conjunctive interpretation.
Vice Chancellor:-“It appears to me that “or” must be construed disjunctively here as the context requires it: and that the testator contemplated that his nephew might not be alive at the death of Mary Tattersall: and, therefore, I think that the nephew did not take an absolute interest in the annuity.”
• The only observation necessary to be made on this case, is that it is very obscure what the Judge could have meant by “ as the context requires it.” We have not the context in the report. But it is plain that the word “or” is disjunctive, unless there is a context to the contrary. And then this case is clear, that when the word is to be disjunctively interpreted, it creates alternative interests in just such a case as the one before this Court.
Then examine the case of Salisbury v. Petty.(p) Assuming here, again, as heretofore, what no lawyer doubts, that a gift to heirs is as good a designation as a gift to issue, though the *324 destination of the gift is different: — then I think that the present case is decided by Salisbury v. Petty.
The testator in that case, John Park, by will dated, 1819, devised to his brother James all his real estate, for life, subject to the payment of two thousand pounds a piece to his nephews and niece, John, Thomas and Mary Park, twelve months from testator’s death, “ or” to their repective lawful issue.
On the death of James, testator devised the estate in remainder to James’s issue, or such of them as he might appoint; increasing the legacies of John, Thomas and Mary, on that event, to five thousand pounds each, “ or to their respective lawful issue.”
Failing issue of James at his death, he then devises the estate to the nephew, John Park, increasing the charge to seven thousand pounds for Thomas and Mary, each.
John dying, without issue, the estate is then given to Thomas, charged with six thousand pounds to Mary, “or her issue.”
Failing Thomas and his issue, the' estate is finally given over, in fee, to Mary.
James, the brother, and John, Thomas and Mary, the nephews and niece, all survived the testator.
John died in 1884, without issue.
Mary died in 1839, leaving six children.
Thomas died in 1839, leaving four children.
James, the brother, died last of all, in 1841, leaving issue.
The construction of the Vice-Chancellor, Sir James Wigram, after an elaborate investigation, was, that “ as to the gift of the first two thousand pounds, the issue” (of the three) “ are to take in case of the death of the legatees, John, Thomas and Mary, in the life of the testator(so much for preventing a lapse.) “ And in the other cases, it is, in the event of the death of the parties, during the life of the tenant for life, the children are to take. The children who survived the tenant for life, take as joint tenants, in substitution for the parents who died in his lifetime.”
*325 It may be observed, in passing, that tbe Judge in commenting on tbe word “ or,” says, I interpose the "words, “ in case of death,” for that must be tbe meaning of tbe word “ or.”
Here, then, we have a complete adjudication of every point that has arisen, or could have arisen in the present case. How closely it resembles tbe present! A devise, constituting a life estate, — successive remainders, — those remainders charged with legacies, the legacies in favor of named individuals, “ or their issue,” death of some with, and others without issue, in life of life-tenant. How much more could be required to make the judgment in that case bear on this ?
Now, of the cases mentioned by me, Price vs. Lockley, and Salisbury vs. Petty, were decided, the one in 1845 and the other in 1843.
In the year last mentioned, was decided our own case of Anderson vs. Smoot,(z) to the same effect. The will in that case gave to the testator’s wife the one-fourth of his personal, estate for life; at her death to be “ equally divided among my surviving children, or the heirs of their bodies, share and share alike.”
In that case the contest, which related to slaves, was between certain of the children of testator who survived the life tenant, and the issue of the other of his children who died during the life-tenancy. And it was held that the will intended to provide for such of the'children as survived, and the issue of those who died. I refer to the judgment for the reasons of that opinion, and for the construction of the word “ or.”
What more authority is wanting ?
There were some observations at the hearing here made upon the form of this legacy. It was presented as a condition personal to Nathaniel, to whom the estate was devised in remainder ; and, then, the attributes of such a condition, under the English law, as to entry of the heir for breach, &c., were *326 ingeniously insisted on. But these doctrines are entirely inapplicable to our laws and institutions.
Then, it was argued that Thomas Heyward had a vested interest at the time he received payment from his brother Nathaniel, and so Nathaniel was discharged of his obligation.
It is not very clear to my own mind, (and I speak here only for myself,) that the interest of Thomas was vested, at least it was not vested for the purposes of this argument.
If we look to the words of the testator, there is no expression of a direct legacy. But if the testator had given to Thomas five thousand pounds at one and two years from the expiration of the life estate, without more, it would be difficult to discover in such a legacy a present vested interest. And when to this is added the fact, that the donation is only to him or his heirs, alternately, at that time, and that the charge upon the estate for securing it, is only from and after the accrual of the remainder, it would be difficult to infer a present vested right in Thomas. The mere fact that it was rendered, by the terms of the donation, dubious and uncertain who was to receive the money, when payable, gives an air of contingency to the whole legacy. Does this look like a vested, transmissible interest in Thomas ?
But again. Thomas did not, as I read his memorandum, receive payment. The instrument creates a mere debt against him for the amount advanced by Nathaniel, with a covenant to set it off against the legacy when due, and an engagement to pay any difference still owing. This is not payment, (I speak still for myself,) it was an advancement by Nathaniel on a contingent security.
But admitting everything contended for, except the discharge of Nathaniel; conceding that Nathaniel did pay the legacy in full to Thomas, — what does the argument avail ? If Thomas had a right to receive and discharge, he must have had as good a right to sell and assign. But the cases I have quoted, in which the contest was between the assignee of the legatee named and *327 his heirs, show, conclusively, that where the heirs have an alternative right, which comes into operation, no such assignment can be allowed to their disappointment.
It remains only to inquire what persons come under the description of heirs of Thomas Heyward.
We have determined in several cases,(v) that under this description, all who are entitled to take under the statutes of distribution, and only such, are entitled: and that these are to he ascertained at the death of the party whose heirs they are.
There are only two of these before us under this bill. The others have made no claim. 'It is clear that of these two, Mrs. Hamilton is entitled. As to the other, the Court would prefer that further inquiry be made.
It is therefore ordered that the decree dismissing the bill be reversed; and that the case be remanded to the Circuit Court for the purpose of inquiring, through the Commissioner, who were the heirs of Thomas Heyward, at his death, and what proportions of the legacy of five thousand pounds each of the plaintiffs was entitled to, according to this opinion, with interest, and which of them have received satisfaction of their interests, or to what extent; and what balance is due to each. A.nd that the Commissioner have leave to report any special matter, embracing, of course, the trusts for a settlement of Mrs. Hamilton’s share.
HARQ-an and Wakdlaw, CC., concurred.

Decree reversed.

 Lowther vs. Condon, 2 Atk. 130.

 Browne vs. Kenyon, 3 Madd. 415.

 Wigram, p. 9.

 Id. pi. 183; and see Rosborough vs. Hemphill, 5 Rich. Eq. 107—110.

 Rosborough vs. Hemphill, 5 Rich. Eq. 105—110.

 1 Russel, 171.

 P. Wzus. 280; 2 Meriy. 25; Wigram, 11; 7 Ves. 368.

 h ) See Templeton vs. Walker, 3 Rich. Eq. 543, 550, et. seq.

 Sir Jas. Wigram, in Salesbury vs. Petty, 3 Hare, 93.

 4 Yes. 418, 434.

 2 Mylne & Keene, 69; S. C. 7 Eng. Cond. Ch. 263.

 6 Beav. 180.

 2 Sim. .225; S. C. 2 Cond. E. Ch. 894.

 3 Hare, 85.

 Spear Eq. 312.

 See Crook vs. Crook, McM. Eq. 104; Buist vs. Dawes, 4 Rich. 415; Rochel vs. Tompkins, 1 Strob. Eq. 144, and Evans vs. Godbold, 6 Rich. Eq. 26.